Good morning, Counsel, Your Honors. May it please the Court. My name is John Barwell, and with me is Antonio Risachi. Together we represent the appellant, Emanuelu Tevita Tunoa, and we would like to reserve five minutes of our time for rebuttal. The most visible and public manifestation of our justice system is the courtroom. Courtrooms are palaces of justice, imbued with a majesty that reflects the gravity of the proceedings. A member of the public who wanders into a courtroom must immediately perceive it as a place where justice is administered fairly and without regard to a person's status. The perception cannot prevail if a party is presented as a lawbreaker, a person who cannot be trusted. When this is allowed to happen, it creates an unacceptable risk of prejudice, which violates a party's constitutional right to a fair trial. Mr. Barwell, I appreciate your words and take them to heart, but even the Supreme Court has recognized that there may be times when the necessity of maintaining the security of the courtroom trumps the right of a defendant to appear without restraints or even in a prison jumpsuit. And what we have here is a case where the district court was presented with information from the assistant warden of the prison as to the concerns with regard to the security of the courtroom given the nature of your client and the length of his sentence and so on. Why doesn't this case fall into that category of cases that the court has recognized that we have to give discretion to the trial judge in order to determine the reasonableness of the security measures taken in a particular case? Judge Tomlin, thank you for the question. In this particular case, we had no evidence that our client was of a security risk or a flight risk at all. Well, are you referring to evidence in the form of sworn testimony? Because we certainly have the assistant warden on the telephone providing the court with information. We can look in the record and see what information prompted the district court to act. So are we talking about procedure here? We're talking about in the record, Your Honor, there is no admissible evidence other than the unsworn testimony of the assistant warden that there's a flight risk. But does it have to be? I mean, there's an awful lot that goes into a trial judge's determination as to what needs to happen in the courtroom. And as long as there's a record of it, are you suggesting that the warden was lying about your client's background? I mean, he was serving, was he not, a very long prison sentence from the state of Hawaii in the custody of the CCA. Yes, our client was convicted of second-degree murder and was serving a lengthy prison sentence. But that's all that we know. So I'm willing to allow that the district judge is entitled in a circumstance such as this to take the, I'll call it testimony, but the word of the prison warden as the circumstances. I don't think it needs to be sworn. So what the district judge knows is that he's serving time for second-degree murder. He's got a very long sentence. Do we know anything other than that from the warden that would say he's a flight risk? I mean, I understand anyone who is a prisoner is potentially a flight risk, but I'm trying to figure out what specifically the district court knew about this defendant. Conviction for second-degree murder, long sentence, anything more that's particularized to this defendant? Judge Fletcher, as far as I know, there was nothing else that was brought up as far as information to make a decision on. And, in fact — So does the district judge know anything about disciplinary record in the prison, flight attempts, fighting, anything? What does the district judge know? Maybe you just answered me. That's all the district judge knows that's particularized to the defendant when she makes the decision. That is correct, Your Honor. That is all the district court knew as far as I can recall. Were you the trial attorney? Yes, Your Honor. So I'm told in the record that he's got shackles. That is to say he's got the ankle braces. Is that correct? Yes, Your Honor. And I'm told that there were three armed guards. How were they positioned in the courtroom? Unarmed. They were not armed. They were unarmed but uniformed guards from the private prison facility at which this incident had occurred. I'm sorry about the unarmed, unarmed. How were they positioned? There were two positioned at or adjacent to the plaintiff's table, and there was one behind us. So how far away from your client? They were all within approximately 10 feet of my client, Your Honor. So they were in front of the bar? Two were in front of the bar at the tables, and one was behind us in the gallery. And how disabling were the ankle shackles in terms of allowing your client to move around quickly, slowly, freely, whatever? He had to shuffle, Your Honor. So they were tied with a chain between the two of them? His ankles were tied with a chain, which were taped together so they would not make noise if he did have to shift his feet. And, Your Honor, I think it's important. Were the shackles visible to the jury? No, and it's important to point that we did not have a problem with the shackles because we recognized there may be a concern. And so because the shackles were obscured with a drape that went around the table. That's normal procedure? Correct, Your Honor. And the expressed concern of the warden was that if he somehow were able to move quickly enough to escape the three guards, despite his shackles, if he were in plain clothes, he could sort of melt into the general population once he gets outside the courtroom. How difficult is it to get out of those shackles? I've personally never worn any, Your Honor, thankfully. But I can't imagine how a prisoner can get out of those shackles while being observed by a court and its security. Well, the warden did say that inmates can slip shackles, that they can get out of them, did he not? That is what the warden said, but there's no evidence that that occurs. There was no testimony on that. We don't know if our client had ever tried to do that. Well, I mean, why can't the district court rely on that? There's no challenge to the warden's statement. Your Honor, the day before we heard the warden's statement, Defendant Perez, his counsel had stipulated to allowing our client to wear a suit, and a judge had ordered it. It was the next morning, right before we called the jury in for Verdeer, that suddenly there was an objection. And we called the warden up, and we didn't have any information to, we didn't have any evidence. I had come into this case well after discovery had closed for the purpose of preparing for trial and taking it to trial. So we had no evidence as far as the security issue. We were never anticipating putting our client in front of a jury in a fluorescent orange prison jumpsuit. And if we had, if we had the opportunity for an evidentiary hearing or do any type of discovery on this issue, we would have learned that the private prison facility where our client was housed at the time, the Saguaro Correctional Facility, is a medium security prison. In fact, the private prison industry in Arizona doesn't have it. I thought he was in administrative segregation. He was in some type of segregation unit within the medium security facility that he was held. But isn't that a high security unit? I don't know. That's what I understand administrative segregation to mean in the prison industry. Your Honor, I'm not even sure that it's true that he was administrative segregation. I know he was in a segregation unit, but I think that's because, at least according to our client, as he represented to us, that was because there was a protection over him. In fact, he wasn't even supposed to be with another cellmate at the time, so that was an administrative error at the prison, I understand, but that's not an issue here. What about the court cited at ER 65 in weighing the prejudicial effect of the jumpsuit, that first that this is not a criminal case, it's a civil case, and given the nature of the claim, the jury is going to know he's incarcerated, particularly when they learn the circumstances of the basis of his claim, which was the extraction from the cell when the window got covered. Your Honor, that's a little bit of a mystery, and I think it's a misunderstanding of the trial court judge at the time. This incident occurred November 2 of 2010. We did this trial May of 2016, nearly six years later. The only thing that was relevant was that he was a prisoner at the time the incident occurred. But I thought the jury learned through the testimony, and there was no objection to this, he was referred to as inmate and that he was serving a life or a very long sentence for murder. I don't believe the jury ever learned the length of the sentence or the fact that it was murder, but the fact that I thought I read that in the record. Did I miss something? I believe that may have been said. Didn't you make – I think you might have made reference to it in your opening statement. Oh, yes. Yes, Your Honor. At this point, our client was already forced to be in his orange prison jumpsuit. He's clearly a current inmate. We had no reason to disguise that at this point. It was an attempt for us to try to draw the sting on the issue that he's still an inmate six years after this incident occurred. And we think that's exactly where the prejudice comes in, and we think it's inherent prejudice. It's actually interesting to me, Your Honor, the very passage that you pointed out at the top of EOR 065 from the court, the court is acknowledging, literally acknowledging the prejudicial effect. And somehow – Well, she's trying to balance. I mean, I understand what she's doing at that point. She's trying to determine whether or not this is an overreaction on the part of the correctional officers or, you know, and part of that equation has to consider what the jury is going to learn based on the nature of his claim. Isn't that a relevant consideration? Well, I question what the judge thought was probative of the issue. We think it is entirely irrelevant that the prisoner was still – that our client was still – This is a security issue that she's trying to resolve here. So we're not looking at it in terms of probative with regard to the nature of the claim. The question is whether or not the prejudice from the jury seeing him in this fashion, given the nature of his case, is really going to be that prejudicial. Isn't that what the court was doing? That's the weighing that she's doing. It's a security weighing, if you will. That is the way that the court described it, Your Honor. Correct. But on EOR-059, bottom of that, toward – or on 060, a little further and halfway down the page at line 15, the Court expresses that this is somewhat of an oddity. It is not unusual that we have more than one U.S. marshal in the courtroom. They're generally not wearing uniforms, although the courtroom security officers are. Sometimes we have three people in the courtroom, so that's fine. I'm not quite sure I understand the security issue with respect to the clothing. And, Your Honor, that's what we're here for. We did not object to just the shackles. Right. But then she goes on to say in the next sentence, but I will say, Mr. Barwell, that the jury is going to know he's still incarcerated. So I'm not quite sure what difference it makes. That was incorrect, Your Honor. We did not contemplate telling the jury that he was still incarcerated. We knew it might come out depending on how our client testified, but no testimony came out about our client's current incarceration or what he was incarcerated for. There may have been some medical records that indicated what he was incarcerated for, but even those records don't – were not current records to the timeframe that we were in trial. So we don't believe there was any reason to let the jury know that our client was still incarcerated or what he was in for. And one of the premises of this case, Your Honor, is the Seventh Circuit case from Judge Posner, Mosby-Baker. And in it, he expresses the difference of being told that a plaintiff is a prisoner versus seeing the plaintiff in orange prison clothes. And Judge Posner writes, Just the contrast between a litigant's wearing prison garb and his opponent's wearing law enforcement uniforms is likely to influence the jury against the prisoner and has been long recognized as highly prejudicial. But you're ignoring some of our Ninth Circuit cases, are you not, where we have approved in appropriate cases these sorts of security measures. Your Honor, this Court, back in just May, just a few months ago, and we may do a supplement – supplemental authority for this, but in May, this Court, en banc, issued an opinion in United States v. Sanchez-Gomez, 859-F3D-649, which states that deferring to correctional or law enforcement officers as to the treatment of individuals appearing in public courtrooms is not the way it's done. The judges should be doing that, not adopting it. But the judge was doing that here. I mean, I don't see an abdication by the trial judge in making the determination as to whether or not she was going to permit it. This is not like that other Seventh Circuit case where the magistrate judge basically shrugged his shoulders and said to the correctional officer, You're in charge, you make the call. That's not what happened here, is it? I think the judge did clearly defer to the prison facility policies, and that's exactly what Sanchez-Gomez says that she can't do. Well, in balancing, I mean, but it's her decision, not the warden's decision. Correct, Your Honor. Okay. But in this case, it seemed to be the warden's decision. We've taken you over time. Let's hear from the other side, and we'll give you a chance to respond. Thank you, Your Honor. Thank you. Good morning, Your Honors. My name is Kevin Nguyen. I represent the defendant, Apolli, Sergeant Armando Perez. Now, when you say Perez, is the real party in interest the Corrections Corporation of America? No, it's Corrections Corporation of America was dismissed as a party. Was dismissed, so it's only against the individual officer? Yes, Your Honor. Do we know whether there's any sort of indemnification agreement between Mr. Perez and his employer? I'm not aware of that. That's not in the record as far as I'm aware. Okay. Thank you. I want to respond to the points that counsel raised. But I'd like to begin, if I may, because I think it's a reasonable starting point, by providing a little perspective, a little context, because I think because plaintiff does not argue actual prejudice in the record, there's a risk of a lot of the content, a lot of the record being lost in abstraction. So to provide a perspective and a little factual background for my responses to the points made, I'd like to point out that the record shows that this case was presided over a senior district judge of the court who was well-experienced in introducing the case. Yes, we know the district judge. She's a very good district judge. And she told the jury she presided over a thousand other cases. And about 20 years ago, she adopted this practice of issuing or having the veneer answer a questionnaire. And that's important because it shows that she was aware of potential prejudice and where it might lurk. And the questionnaire was a useful tool for her, she found, and she adopted this practice because it allowed the members of the veneer to candidly and truthfully answer. You know, this is kind of beside the point, as far as I can tell. Can you tell me where you're going with the veneer questions? Sure. Because the answer to the veneer questions was — showed that this jury was well aware of the fact that plaintiff was a current inmate suing the corrections officers for allegations of excessive force and requesting damages, and asked the And so the questionnaire was actually the first thing that the jurors saw in this case. And so they were well aware of — And was the plaintiff already in his jumpsuit during the veneer? He was. He was. And do we know when the questionnaire was drawn up? Meaning, the argument from the other side is, well, once it's clear that he's going to wear the jumpsuit, they have absolutely zero interest in pretending that he's anything other than an incarcerated inmate. So once he's in the jumpsuit, it's a perfectly sensible thing to ask. But I'm not sure that it does anything other than sort of ask the normal jury questions about potential bias. When was the questionnaire circulated? Before the veneer reported for jury? It was. It was sent to the potential members of the veneer, and based on the answers that were submitted, the attorneys or counsel had the opportunity to directly question the veneer when they showed up. Let me ask the question that Judge Tallman asked to make sure that you understood it. Okay. And that I understood your answer. There was a determination that the plaintiff would wear his jumpsuit. And we have also the questionnaire that's handed out. Yes. Is the questionnaire as it's being handed out, was it drafted before the plaintiff knew or the plaintiff's lawyer knew that he was going to be in the jumpsuit at trial? It was. It was, okay. It was. But what plaintiff wore at trial really didn't matter, and that's because the questionnaire revealed that there was no potential prejudice because of his inmate status, and the four-day process fleshed that out. Excuse me. Yes. Are you suggesting that the fact that he would be identified early on as an inmate, would trump his right not to come in the courtroom in the colors? No. In other words, that wasn't a question on the questionnaire to the venere, that is whether or not a person wearing an orange uniform would be offensive or whatever. That was not the question. Just simply the question having to do with whether or not as an inmate he would get a fair hearing, right? Right. But it doesn't – certainly it doesn't trump his right, but it does address plaintiff's concern that the jury wouldn't have otherwise known. Right. Now, do you have the precise question in the veneer? Yes. Actually, this may make a difference, because if the question is, would it make any difference to you that he was an inmate when this happened, well, that's obvious. Yes. If the question is, does it make a difference to you that he's currently an inmate, that's the relevant question. And was that the question that was asked? Well, the language is this. It's Supplemental Excerpt of Record 764. 764. Hang on a second. Supplemental 764. Yes, Your Honor. Go ahead and read the question. Okay. I've got it in front of me now. Go ahead and read. Yep. Parties through counsel submit the stipulated request for jury verdere questions to be posed by the court to the jury panel during jury selection. One, and this is the first question presented. This case involves a dispute between an inmate and a correctional officer that occurred at a correctional facility owned and operated by a private prison company. The inmate alleges that the correctional officer used excessive force against him during a self-extraction, resulting in physical and emotional injuries. The defendant denies the allegation. The jury will be asked to decide whether the inmate's constitutional rights were violated and whether the inmate was subjected to assault, battery, and intentional infliction of emotional distress, as well as to award damages. You know, this is less than explicit as to whether he's currently an inmate. I think in ordinary language reading, this says this involves a dispute between an inmate and a correctional officer, and this is now a suit over what happened at that time while he was an inmate. And will he be able to decide the case fairly despite the fact that this is a dispute between an inmate at the time the thing happened? I don't think this says to them he is currently incarcerated. But counsel told him during fordere, following up this questionnaire. But at that time, if we're actually in the voir dire, he's in a jumpsuit. Yes. Yes, he's already in a jumpsuit. So at that point, according to the other side, he's, quote, trying to draw the sting. Well, drawing the sting, Your Honor, is when anticipating the opposing party's arguments and beating them to the punch so that the blow is lessened. Here's what really bothers me about this case. It strikes me that the security concern is real. I mean, any time you have an inmate in a courtroom, there's a real security concern. We have him shackled. His legs are not only shackled at the ankles, but they're chained together. I'm sorry. Just to provide clarity, they're slightly larger than handcuffs. And they're like a larger version of handcuffs. Right. And they're actually called leg cuffs. Okay. Right. But connected by a chain. But connected by a chain. You're correct. So it's a hobble. Yes. If we're talking about a horse, it's a hobble.  If we're talking about an inmate, it's a shackle, and his feet are chained together so that he can walk. Yes. But it's at a shuffle. Yes. We have three guards stationed within very short distance. Sounds like about 10 feet away. Yes. And the question is, do you need the additional security of an orange jumpsuit throughout the trial? I've never heard of a case in which we've had to have all of those, including the jumpsuit. I presided over a civil trial a couple years ago. In fact, it was a hung jury. We did it twice. It was an inmate in San Quentin. He was dressed in civilian clothes. There were guards from San Quentin here. They didn't even shackle him. They thought it was sufficient that they have the guards there. That strikes me that this is excessive. And one of the things that bothers me, and I'm not sure whether it's legally relevant. The imprisoning authority is a private company. And so you get the warden of the private company calling up on the phone trying to get what is, to some extent, an advantage in the trial by addressing the plaintiff in what is an orange jumpsuit that will remind the jury every second during the trial that this is a prisoner. That does not strike me as fair. I have three responses to that. First, the security reasons that justify these measures were never really disputed. He's a high-custody inmate serving. What does a high-custody inmate mean, and what did the district judge know about high-custody inmates? Well, there's Plaintiff's Trial Exhibit 7, which was later admitted and stipulated in his evidence, that shows statements by the plaintiff himself. It's a July 2013 progress report, and it very explicitly says that he's, if I may like to quote from it, Supplemental Excerpts of Record 389. Okay. Please go ahead. And it shows an inmate who is very dangerous. He admits homicide attempt in the past. I'm here for murder in second degree. Started gangbanging. Incarcerated for murder. I have been incarcerated since 2003. I've got the page. I want to read along with you. Oh, I'm sorry. How long are you? I apologize. I'm in the – the paragraphs aren't indented, but the third full paragraph, halfway down. The paragraph that begins 32-year-old Hawaiian? Yes, yes. Okay, okay. Admits homicide attempt in the past, so that's about third line down towards the end there. I'm here for murder in second degree. Next line. Well, two lines down. I started gangbanging. Later in that line. Incarcerated for murder. I've been incarcerated since 2003. Serving life with eligible for parole after 80 years. I don't think I'll make it. Arrived here at SEC in 2007. Has been in SEG for 18 months for protecting myself. Another inmate who was a separatist started hit me. I was convicted shooting his brother, which I am still fighting. That's why I'm trying to prove. Now, that doesn't really tell us a lot more than the fact that he's been convicted for murder. I mean, he says, yeah, that's what I did and that's what I'm in for. And I'm in ad seg because apparently the brother of the guy I killed is in here and he doesn't like me. Well, he has reason to escape if he wanted to. But I don't see what this tells us really beyond the fact that this is a man who's in prison with a very long sentence for murder. I got that. Okay. Well, there was really no dispute that he was a flight risk. Whether or not that was possible, maybe. I take it as a given that prisoners as a generic category are flight risks. But your point, I think, is that he's got nothing to lose. He's got nothing to lose, and it would just be easier. Inmates, according to this, actually it's the assistant warden who testified, but not testified. Right. But the second point I wanted to make was that there was no strategy or advantage in doing this. Although – Well, I'm not sure about the strategy. I'm quite sure about the advantage, and the question is how much of an advantage and was it an unfair advantage? Well, there was no intent to obtain an advantage. It was purely for security reasons. And how do you know that? Well, because we had no reason to object to the uniform, and we did not object initially, until we learned from the facility officials that there is this – When you learned from the client. Well, the people who are in charge of his custody and are responsible for him. But is the courtroom scene really an excessive display of force? There's three unarmed officers sitting. I'm not sure. I have to say, for me, it's not the officers. It's the jumpsuit. That's what bothers me. Okay. Well, let's follow that fact, then. He's wearing a jumpsuit. Well, we don't know what color it is. I think we're told in the record that it's orange. The assistant warden said it was red. In the reply, it suddenly became a fluorescent bright orange jumpsuit. But whatever color – Can we settle on distinctive bright color? But whatever color it was, it identified him as an inmate still. But why does that matter? Does that make him inherently dangerous? People are convicted of nonviolent crimes all the time. Every day, in every trial across the country, if you've got a kid who's gotten in trouble and he's got a horrible sort of – he wears chains. I don't know what kind of stereotype you want to do. His lawyer always makes him get a haircut and buy a suit. Every lawyer knows this. You do, too. And there's a reason they do that. And every lawyer also says, don't commit any disciplinary violations in the next 48 hours. Right. And maybe that advice was given, too. We have no evidence of misbehavior in the courtroom here. That's not on point. Right. But a juror – place yourself, please, in the shoes of a juror looking at this scene. He's wearing a – A distinctive brightly colored jumpsuit. We don't know if it's brightly. We know it's red or orange. That's all we know because orange came from counsel's statement, actually. So that's really not – It might have come from me, but I apologize. I'll take it back. But that doesn't necessarily – It's on the orange-red side of the spectrum. Okay. But it doesn't mean that he's dangerous. And you're correct that the security personnel, that doesn't mean anything. The Supreme Court and this Court have said that's routine. Well, I'm not sure it doesn't mean anything, but I don't think it's objectionable. Sure. Right. So – but even if a juror were to infer that he was dangerous, why is that material to any – how is that prejudicial? It wasn't. That's a rhetorical question. It wasn't because the jury did not have to decide any issue that was affected by that perception, even if they drew it. Both parties agreed that the plaintiff was the least aggressive inmate in this cell extraction, that his cellmate was the violent, aggressive one that wanted to provoke the cell extraction to fight with staff, but that he was just passive, a passive participant. And when he – and when the cell extraction team entered the cell – by the way, Sergeant Perez was the last member of the seven-man cell extraction team to enter the cell, and his task was very specific. It was to restrain the lower legs of the least aggressive inmate. Well, now you're getting into the testimony as to what happened. I'm not sure how interested we should be at this point. Okay. Well, there was no dispute that he was not – he did not actively, physically resist restraints. He was not violent. So it didn't affect any determination that they made. So even if they were to perceive him as a dangerous inmate now and say, well, he must have been dangerous then, it didn't affect any issue that they really had to decide that was determinative of the outcome of this case. Okay. We're over time. Any further questions from the judges? I have none. Okay. Thank you very much.  Why don't we put two minutes on the clock? Thank you, Your Honor. I'm not sure that it matters of the color of the jumpsuit, but just for the record, I'd like to point out on EUR-064 at lines 16 through 20, where I explained to the district court, we still believe that he should have the opportunity to wear the street clothes. Having the visual of an orange jumpsuit we think will prejudice the jury. Okay. And you were trial counsel? Yes, Your Honor. So not only are you saying that on the record then, but you say it wasn't how it was orange? Yes, it was fluorescent orange, Your Honor. And I'll agree with you that it makes much difference whether it's orange or red. Okay. I think it's appropriate to point out the standard that the U.S. Supreme Court enunciated in Holbrook v. Flynn, which the Ninth Circuit has adopted via the case Hayes v. Ayers. And in that standard, the Supreme Court says, and this is the standard for analyzing whether courtroom security measures violate a criminal defendant's right to a fair  But this, I think, can apply equally to a civil trial as well. And it says, first, we look to the scene presented to the jurors and determine whether what they saw was so inherently prejudicial as to pose an unacceptable threat to the defendant's right to a fair trial. So is your position then that we should announce a rule that under no circumstances in a civil trial, even if it has to do with events of excessive force in a prison, may the plaintiff be required to wear prison clothing? We're not advocating for that, Your Honor. What we're advocating is something similar to what the Ninth Circuit recently did in Gomez-Sanchez, which is to require a particularized finding of a need for heightened security measures. We have a case where our client was restrained in three different ways. We know he was restrained at the ankles, by leg cuffs, or however you want to describe those. We know that there were three uniformed officers. Okay. I mean, we know all of that. But wait a minute. You were giving me three. And so far, I only know two, because I would have only been able to know two. What's the third one? Thank you, Your Honor. And I'm glad you gave me that opportunity. The third one was the orange prison jumpsuit itself. Okay. But my question then is, if we're judging the ruling by the district judge on an abuse of discretion standard, how did she abuse her discretion here? She made no actual finding for a particularized need for a heightened security measure. Sure she did. She credited the statement by the assistant warden that if he was able to somehow escape the courtroom, that he would be able to blend in to the people outside on the street much more easily if he was wearing street clothes than if he were in an orange jumpsuit. So how did the district court abuse its discretion in making that conclusion under United States v. Hinkson and the other standards that we have articulated for gauging abuse of discretion? To me, it's an inherently factual determination. And as long as the district court articulates reasonable reasons for its ruling, it's hard for me to say that there's an abuse of discretion here. Your Honor, had we had the opportunity, we would have been able to discover information and evidence to present to the trial court that showed that there was no need for any heightened security measures in this case. Well, I mean, you were there and she asked you to respond after you heard what the assistant warden had to say, did you not? Yes, Your Honor. And we explained that we still do not believe there's any reason to. Counsel, I understand you're the advocate, but what more would you have offered? Well, we would have offered, in fact, we do have a motion to take judicial notice of this fact that we can file or hand in. But it's of Arizona public record from the Corrections Corporation of America to Arizona explaining that this facility was a medium security facility. But that doesn't answer the question as to whether or not this particular inmate, given the nature and circumstances of his offense and the nature of the case he was trying, posed a security risk in the courtroom, does it? Well, he wasn't handcuffed, Your Honor, and he made no threatening gesture with his hands. Mr. Risacci and I were sitting right next to him, flanking him. He was very friendly with us. We don't think that there was... where the client stabbed his lawyer with a pencil in the hand. I mean, it's difficult sometimes to anticipate when you're going to have a problem. Your Honor, this is an individual, whether he was going to be in prison for the rest of his life or not, that was trying to redress his constitutional wrongs.  If we were to adopt the rule that I think you're really asking us to adopt, what would prevent an inmate as part of an escape plan from filing a civil rights action against the correctional facility or its officers in order to get out of administrative segregation and get to a courthouse where their chances of escaping might be much better than escaping from a prison? I think there's several reasons, Your Honor. First, time and patience. I can't imagine that one would plan something out for that long when they're in a prison. Right when you're serving a life sentence with nothing else to do? But more importantly, Your Honor, this is a situation in which our client was seeking to correct a wrong that he felt occurred to him. And people generally aren't going to just make up something like that and go through the procedure. It took him three or four years just to find me and get to trial. So this is something that he was working on for a very, very long time. And I think that if there was a standard that required a particularized finding, just like the Ninth Circuit recently did in the Gomez-Sanchez case, and that case was about the immigrant detainees being brought in all at the same time, all in chains for arraignments and any other type of proceeding. But those are people who have just been arrested and we're about to arraign them. This is a convicted, sentenced offender who is serving a long prison sentence, and he has brought a claim of wrongdoing that he alleges a civil action that occurred inside the prison while he was there. That's a very different situation from the presumption of innocence that attends individuals who have just been arrested who are being brought in for an initial appearance. And I think it's important to note, Your Honor, that there is no constitutional guarantee that a prisoner can testify at his own civil trial. Well, and there's no presumption of innocence either. Correct. But in this situation — It's not a criminal case. We think that if a prisoner plaintiff can get over the hurdle of getting to court in order to testify at his own civil trial, then why not have some evidentiary hearing to determine the scope of that prisoner's threat? The district court agreed. So what additional evidence would you have offered to the district judge if there had been a more fulsome hearing than what we have reflected in the record? It is hard to know, Your Honor. We had no discovery on whether our client was a current threat. So at this point, you can't really cite me any other evidence that the court should have considered? Well, what I would say is what we did find just recently on my own was a public record in the Arizona Department of Corrections website from the CCA that describes the facility as medium security. Counsel, have you ever been in a prison? Have you ever taken a tour of one? Yes, Your Honor. Okay. And even in medium security prisons, they have to have cells called administrative segregation  or they attack other inmates or correctional officers. Just because you're in a minimum or medium security prison doesn't mean that those sorts of nefarious activities can't happen. It also doesn't mean that every time a prisoner comes into court, they should be in a prison jumpsuit surrounded by uniformed guards and shackled. So you do want a rule that basically forbids it in every civil case? No, Your Honor. That's not what we're advocating. We're asking for a standard that requires some type of evidentiary finding that there's a need for the heightened security measures. And you don't think that Judge Silver did that on this record? No, Your Honor. Not appropriately and not with enough notice to us to be able to fully prepare for that type of battle. Again, the day before. You can help me with something. What's the timeline with respect to the dismissal of Correctional Corporation of America? At what point were they dismissed from the case? That was before my involvement, and it was a lack of service, I believe. Your Honor, it might have been an early motion to dismiss. I'm less familiar with the pre-procedure. So they've been out for quite a while? Yes, Your Honor. Okay. Okay. Any further questions from the bench? Thank both sides for their arguments. The case of Tenor v. Perez now submitted for decision,  Thank you, Your Honors.
judges: W. Fletcher, Tallman, Hoyt